AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
Middle District of Louisiana

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>16141 Bristoe Avenue, Apartment D,<br>Baton Rouge, Louisiana 70816 | )<br>)<br>)<br>)<br>)<br>) | Case No.  15- MJ-103 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

### SEE ATTACHMENT "A"

located in the _____ Middle _____ District of _____ Louisiana _____ , there is now concealed *(identify the person or describe the property to be seized)*:

### SEE ATTACHMENT "B"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) and 846;  18 U.S.C. §§ 922(g)(1), 924(c)(1)(A), and 2. | Distribution of a Controlled Substance; Conspiracy to Distribute a Controlled Substance; Possession of a Firearm by a Convicted Felon; and Possession of a Firearm in Furtherance of a Drug Trafficking Crime. |

The application is based on these facts:

### SEE ATTACHED AFFIDAVIT

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Brett D. Skiles, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____ 08/27/2015 _____

*Judge's signature*

City and state: Baton Rouge, Louisiana

Richard L. Bourgeois, Jr., Magistrate Judge
*Printed name and title*

## ATTACHMENT "A"

1.      The residential location to be searched is 16141 Bristoe Avenue, Apartment D, Baton Rouge, Louisiana, 70816.  This location is a residential apartment located on the ground-level of a two story apartment building.  If traveling north on O'Neal Lane, take a right (east) on Bristoe Avenue, and, in approximately 300 feet, Apartment D is located in the second residential apartment building on the left (the north side of Bristoe Avenue).  The front door of the apartment faces south.  The letter "D" appears on the front door. Additionally, Apartment "D" is located on the western side of the building, and there is a parking lot in front of the building.

# ATTACHMENT "B"

Items to be searched for and seized include:

1.  Cocaine, cocaine base, and other illegal drugs.

2.  Drug paraphernalia, including: scales, plastic baggies, plastic wrappers, and other plastic materials used to house cocaine and cocaine base for sale to customers.

3.  Pots, pans, or other dishes, items or containers used to convert cocaine into cocaine base, containing cocaine or cocaine base residue.

4.  Baking soda and other chemicals commonly used to covert cocaine into cocaine base.

5.  Sums of cash or currency.

6.  Any records of past, present or future drug transactions, legers or logs containing information about other drug dealers or transactions.

7.  Any firearms and/or ammunition.

## AFFIDAVIT OF BRETT D. SKILES

I, Brett D. Skiles, being duly sworn, declare and state as follows:

## OVERVIEW AND PURPOSE OF AFFIDAVIT

1.     I am a Special Agent of the Federal Bureau of Investigation (FBI) and have been so employed since March 24, 2002.  As a Special Agent, I conduct investigations of alleged violations of federal criminal laws.  I am authorized to obtain and execute arrest and search warrants.  I have conducted violent gang and drug investigations, interviewed numerous cooperating drug defendants, conducted numerous controlled drug evidence purchases using confidential sources (CS's), consensually monitored and recorded phone calls between CS's and the targets of drug investigations, written Title III affidavits in gang and drug investigations and monitored Title III intercepts to and from the targets of gang and drug investigations.  Additionally, I have conducted numerous physical surveillance activities on the targets of illegal drug investigations.

2.     As set forth below, I am conducting an investigation with the Baton Rouge Police Department and East Baton Rouge Parish Sheriff's Office into a cocaine, cocaine base, heroin, marijuana and illegal prescription pill distribution network identified as the **HENRY STERLING IV** Drug Trafficking Organization (DTO) (hereinafter the "**STERLING DTO**").  We have identified numerous members of the **STERLING DTO** including, in pertinent part: **HENRY STERLING IV**, a.k.a. "Nick Sterling," "Kid," and "Rich Kid" (hereinafter **HENRY STERLING**) and **MERCEDES WILLIAMS** (hereinafter **MERCEDES WILLIAMS**).  This affidavit is made in support of an application for a search warrant to search property believed to be associated with **HENRY STERLING** and

**MERCEDES WILLIAMS** (described in Attachment A) for evidence related to possible criminal violations including, but not limited to, Title 21, United States Code, Sections 841(a)(1) and 846, and Title 18, United States Code, Sections 922(g)(1), 924(c)(1)(A) and 2. Except where otherwise set forth herein, the information contained in this affidavit is based on my personal knowledge, on information provided to me, directly or indirectly, by other law enforcement officers, and on my experience, training and background as a Special Agent of the FBI.

3.     Because this affidavit is made for the limited purpose of obtaining a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts which I believe are sufficient to establish probable cause for the issuance of a search warrant.

**BACKGROUND**

4.     Affiant is assigned to the Capital Area Gang Task Force (CAGTF) which is comprised of the Federal Bureau of Investigation, East Baton Rouge Parish Sheriff's Office, Baton Rouge Police Department and the Ascension Parish Sheriff's Office. The CAGTF investigates violent gangs and illegal drug trafficking in the greater Baton Rouge area.

5.     Beginning in October of 2014, Affiant and Task Force Officer (TFO) Charles Karras interviewed a CS related to the illegal drug activities of the **STERLING DTO**, to include **HENRY STERLING**, **CHRISTOPHER STERLING**, and their associates. CS was in a position to conduct recorded telephone calls and controlled drug evidence purchases with **HENRY STERLING**. From January of 2015 through May of 2015, CS conducted three controlled drug evidence purchases of cocaine base with **HENRY STERLING**. The CAGTF conducted surveillance during the controlled drug evidence purchases, and the drug

2

purchases were recorded on audio and video. Prior to each controlled drug evidence purchase, CS made consensually recorded telephone calls with **HENRY STERLING** to arrange the drug transactions.

6.      Based on the controlled drug evidence purchases and consensually recorded telephone calls between CS and **HENRY STERLING**, Affiant obtained an Application and Order for a Title III intercept of **HENRY STERLING's** cell phone. On July 7, 2015, The Honorable Brian A. Jackson, Chief Judge, Middle District of Louisiana, signed an Order authorizing the interception of wire and electronic communications occurring over **HENRY STERLING's** cell phone. On July, 8, 2015, Agents began intercepting communications occurring over **HENRY STERLING's** cell phone. On August 5, 2015, The Honorable Brian A. Jackson signed an Order authorizing the continued interception of wire and electronic communications occurring over **HENRY STERLING's** cell phone, set to expire on or about September 4, 2015.

7.      During the Title III wire and electronic interceptions, Affiant monitored wire interceptions wherein **HENRY STERLING** identified himself to the other caller, or the caller talking to **HENRY STERLING** used **HENRY STERLING's** name or alias. After listening to interceptions in which **HENRY STERLING** was identified, either by himself or by the caller, Affiant can now identify **HENRY STERLING's** voice and has made those identifications in the paragraphs below.

**FACTS ESTABLISHING PROBABLE CAUSE**

8.      The evidence proves that **HENRY STERLING** currently resides with his girlfriend, **MERCEDES WILLIAMS**, at 16141 Bristoe Avenue, Apartment D, Baton Rouge, Louisiana, 70816.   The evidence also shows that **MERCEDES WILLIAMS** assists

3

and furthers the **STERLING DTO's** drug trafficking by allowing **HENRY STERLING** to store cocaine and/or cocaine base at her apartment (16141 Bristoe Avenue, Apartment D, Baton Rouge, Louisiana, 70816) and selling cocaine and/or cocaine base. During physical surveillance (including pole camera surveillance) conducted in conjunction with the Title III wire and electronic interceptions, **HENRY STERLING** and **MERCEDES WILLIAMS** reside at 16141 Bristoe Avenue, Apartment D, Baton Rouge, Louisiana, 70816, and arrange and conduct drug deals from this location. Additionally, through surveillance, agents have discovered that **HENRY STERLING** frequently uses **MERCEDES WILLIAMS'** vehicle to transport cocaine and/or cocaine base during drug deals, and **HENRY STERLING** stores a firearm inside the vehicle.

9.     On July 26, 2015, at approximately 3:44 p.m., agents intercepted a telephone call (Session 3001) initiated by **HENRY STERLING** to an unknown male. During the call, the following exchange occurred between **HENRY STERLING** and the male:

> UM: …Where you going to be at?
> STERLING: I'm at my girl house off of O'Neal, you probably need to come see where this shit's at so you can know where I'm going to be at.
> UM: Alright, I'll call you in a little bit when I (unintelligible) when I (unintelligible) when I go out O'Neil, I go left or right?
> STERLING: You going to the right and turn like where that Hardee's at, as soon as you turn where the Hardee's at, the first apartment complex, it's going to be right there.
> UM: Alright, I'll call you when I get outside.

10.     During the above telephone conversation, **HENRY STERLING** tells the unknown male to drive to **MERCEDES WILLIAMS'** apartment (located at 16141 Bristoe Avenue, Apartment D, Baton Rouge, Louisiana, 70816), because that is where **HENRY STERLING** is currently at and plans to reside. **HENRY STERLING** also gives the unknown male driving directions to the apartment. Based on physical surveillance

4

conducted in the vicinity of the apartment, there is a Hardee's restaurant off of O'Neal Lane

similarly situated as described by **HENRY STERLING** when providing driving directions

to the unknown male.

11.    On July 30, 2015, at approximately 6:31 p.m., agents intercepted a telephone

call (Session 3552) initiated by an unknown male to **HENRY STERLING**.  During the call,

the following exchange occurred between the male and **HENRY STERLING**:

> STERLING:  What up with it, Big Boy?
> UM:  I was just checking back with you seeing if you was still busy or whatever, you know?
> STERLING:  What now?  What now?  What I was supposed to be doing for you?
> UM:  (Unintelligible) if I waited until in the morning I would, gave you seven-thirty, seven-fifty, whatever, but shit, right now he come got the last what I had, I just wanted give you cash for like a little ball or something, you know?
> STERLING:  Oh, alright, I'ma, give me, I'm fixing to call you right back.  A ball you want?
> UM:  Yeah, well, I mean that's all I got the money for right now, he, he, his money gonna clear the bank at 2:00 in the morning.  I'm go get, I'm go get that at two and I'm give you that, you know what I'm saying?
> STERLING:  Alright.
> UM:  What I owe, you know.
> STERLING:  Alright.
> UM:  You know, I was hoping you be able to do the same thing, you know.
> STERLING:  Alright.
> UM:  You know, I got this here right now, I was gonna go head on and put that to work right now, you know.
> STERLING:  Alright.
> UM:  You know, cause he gonna want to see, he gonna wanna, he did that about 11:00 today and he told me he was gonna want something tonight, so I'm just trying to get him while I can get him, you know.
> STERLING:  Alright.
> UM:  Alright.

12.    During the above telephone conversation, the unknown male called **HENRY**

**STERLING** to purchase one-eighth-of-an-ounce of cocaine or cocaine base.  The male

explained he owed **HENRY STERLING** money for cocaine or cocaine base **HENRY**

**STERLING** had previously "fronted" to him.  The unknown male stated that he has some

5

money to pay his debt, but instead wanted to purchase one-eighth-of-an-ounce of cocaine or cocaine base for cash, and pay **HENRY STERLING** for his debt at a later time. **HENRY STERLING** agreed to the drug deal, and confirmed that the male wanted to purchase one-eighth-of-an-ounce of cocaine or cocaine base. The unknown male told **HENRY STERLING** he only had enough cash to purchase one-eighth-of-an-ounce of cocaine or cocaine base, but that when he received payment for the previously "fronted" cocaine or cocaine base, he would pay **HENRY STERLING**. The unknown male then explained that a drug customer purchased all of the cocaine or cocaine base the unknown male possessed, but the drug customer stated that he would return to the unknown male later that night to purchase additional cocaine or cocaine base. Thus, the unknown male needs to purchase one-eighth-of-an-ounce of cocaine or cocaine base from **HENRY STERLING** in order to sell it to his drug customer returning later that night.

13.     On July 30, 2015, at approximately 8:24 p.m., agents intercepted a telephone call (Session 3570) initiated by **HENRY STERLING** to the unknown male from Session 3552. During the call, the following exchange occurred between **HENRY STERLING** and the male:

> UM: Hello.
> STERLING: What up?
> UM: Ah, I was just laying here waiting on you to call me, you know.
> STERLING: Man, I meet you at that Conoco.
> UM: Huh?
> STERLING: Meet you in the same place I met you the other day at that gas station.
> UM: (unintelligible) I can't, that's on O'Neal?
> STERLING: Yeah.
> UM: I thought that was Mobile.
> STERLING: Oh yeah, Mobile, yeah, I meant to say Mobile.
> UM: You act like, you know you could, if you want to you could take this, this, this, this hundred and forty and put it towards another one of them things, you know, cause I'm gonna give your money in the morning.

6

STERLING:  I just want you to keep that shit there straight.
UM:  Okay, that's cool, that's cool, that's cool, I'll be there in about five minutes, I don't play.
STERLING:  No, make it in like ten minutes, bra.
UM:  Ten minutes, okay.

14.     During the above telephone conversation, **HENRY STERLING** called the male from Session 3552 to tell him to meet at the Mobile gas station on O'Neal Lane for their drug transaction.  The male knew the location of the Mobile gas station because he and **HENRY STERLING** conducted a previous drug deal at that location.  The male then asked **HENRY STERLING** if he wanted to take the money for the eighth-of-an-ounce of cocaine or cocaine base and put it towards an ounce of cocaine or cocaine base.  The male would then pay **HENRY STERLING** for the previously "fronted" cocaine or cocaine base and the remainder of the ounce of cocaine or cocaine base later.  **HENRY STERLING** told the male he did not want to "front" the male any more cocaine or cocaine base.  The male then advised he would be at the Mobile gas station in five minutes, to which **HENRY STERLING** told the male to be there in ten minutes.

15.     Agents were conducting physical surveillance on **HENRY STERLING** at the time of the wire interceptions captured in Sessions 3552 and 3570.  **HENRY STERLING** was at **MERCEDES WILLIAMS'** apartment during the telephone calls.  At approximately 8:40 p.m., Affiant observed **MERCEDES WILLIAMS'** maroon 2010 Honda Accord bearing Louisiana license plate XYT 021, travel north on O'Neal Lane.  Due to low light conditions, agents could only determine the vehicle was driven by a black male suspected to be **HENRY STERLING**.

7

16.     At approximately 8:42 p.m., Agents observed the Honda Accord arrive at a
Mobile gas station located at 1640 O'Neal Lane.  The Honda Accord traveled to the south
side of the gas station, then departed the gas station and proceeded south on O'Neal Lane.
At approximately 8:43 p.m., agents saw a red Chevrolet Cruzer bearing Louisiana license
plate XMF 036 driven by a black male depart the same area of the Mobile gas station from
which the Honda Accord was observed.  The red Chevrolet Cruzer followed the path of the
Honda Accord, then turned south onto O'Neal Lane.  Agents terminated surveillance so as
not to be observed by the occupants of either vehicle.  Based on the above physical
surveillance, wire interceptions, and Affiant's training and experience, Affiant believes the
male driving the Honda Accord was **HENRY STERLING** who was meeting the unknown
male captured in Sessions 3552 and 3570 and driving the Chevrolet Cruzer to conduct a drug
transaction.

17.     On August 2, 2015, at approximately 3:06 p.m., agents intercepted a telephone
call (Session 4219) initiated by **HENRY STERLING** to an individual referred to as
"HINEY".  During the call, the following exchange occurred between **HENRY STERLING**
and HINEY:

> HINEY:  Uh, uh, where the fuck you at?  Out the area?
> STERLING:  Yeah, what's happening?
> HINEY:  Awe, shit ain't happening if you out the area.  Boy, where you at?  The
> doctor somewhere?
> STERLING:  Uh, no, I'm with my boys and them, what you got (unintelligible)?
> UM:  Man, I'm just seeing what the fuck they had going and where you at.  Because,
> um, whatamacallem be trying to holler, um, back at ya.
> STERLING:  Man, see, that's what I was trying.
> HINEY:  Now he's trying to holler back at me.
> STERLING:  See, that why I was trying to turn you on to that other shit, so ya'll
> could a be done got rich right now.

8

HINEY: No! Uh uh! You know one thing, I want the quan. I ain't lying, like that other shit, that shit was, and you know one thing, you know I got a house, bruh, you know, I gotta keep that bitch there (unintelligible).
STERLING: Oh, you ain't like, you ain't like (unintelligible).
HINEY: Huh? Oh yeah.
STERLING: (Unintelligible)
HINEY: I liked the other one. The one last night, but I ain't fucked with it till, uh, today though. That bitch there, its (unintelligible).
STERLING: Oh yeah, yeah, that shit be retarded, but I just be like on the different colors, you know what I'm saying?
HINEY: Yeah.
STERLING: (Unintelligible) that, that, that other shit.
HINEY: Boy, ay, ay, you had to bust off for real? You gone, gone?
STERLING: Yeah, but, uh, what you is talking about, Hiney?
HINEY: (Unintelligible) nigger might want, uh, four or a nine or something.
STERLING: Goddamn, man, you would wait until I leave (unintelligible).
HINEY: What I'm saying, you, you ain't coming back tonight?
STERLING: No, I'm probably gonna be back tomorrow.
HINEY: Alright then, nigger, hit me up.
STERLING: Yeah, yeah, I don't, if you wouldn't have, if I wouldn't have been gone. I probably got about one or two of them bitches I could (unintelligible). Get her for to bring them to you or something.
HINEY: Alright then, that will be cool, that too, I'll just tell him, you know, it ain't nothing but two?
STERLING: Yeah, it probably won't be but about two of them bitches.
HINEY: Alright then, I'm gonna ya, and uh.
STERLING: (Unintelligible)
HINEY: Aye, Kid.
STERLING: Huh?
HINEY: I'ma call you when the nigger come back out, but you know, he ain't gonna, you know, he's like me, we ain't gonna fuck around tonight, but uh.
STERLING: You don't want to come to Atlanta with me, huh?
HINEY: When you going to Atlanta?
STERLING: Shit, right now, nigger.
HINEY: Right now? Hell no, I going nowhere right now, boy. I'm trying to make my nickels back, boy.
STERLING: I know what you mean.
HINEY: Shit (unintelligible).
STERLING: Hold on.

18.    During the above telephone conversation, HINEY asked **HENRY**

**STERLING** where he was at, because HINEY wanted to buy cocaine or cocaine base from

**HENRY STERLING**. HINEY stated that a drug customer known to both **HENRY**

9

STERLING and HINEY tried to call **HENRY STERLING** to purchase cocaine or cocaine

base, but was now calling HINEY.  HINEY asked **HENRY STERLING** if he was out of

town.  **HENRY STERLING** stated he was out of Baton Rouge and asked HINEY what he

wanted to purchase.  HINEY told **HENRY STERLING** that a drug customer may want four

or nine ounces of cocaine.  **HENRY STERLING** sarcastically told HINEY that HINEY

would wait until **HENRY STERLING** leaves Baton Rouge to arrange a large drug

transaction.  HINEY asked if **HENRY STERLING** would return to Baton Rouge that night,

to which **HENRY STERLING** told HINEY he would not be back that night, but that he

may return the following night.  **HENRY STERLING** then told HINEY he had one to two

ounces of cocaine he could get **MERCEDES WILLIAMS** to bring to HINEY.  HINEY

agreed to buy two ounces of cocaine from **HENRY STERLING** through **MERCEDES

WILLIAMS**.  **HENRY STERLING** asked HINEY if HINEY wanted to go to Atlanta,

Georgia, with him.  HINEY declined to go on the trip because he needed to make money.

During the call, **HENRY STERLING** switched to a call from **MERCEDES WILLIAMS**.

19.    On August 2, 2015, at approximately 3:10 p.m., agents intercepted a telephone

call (Session 4222) initiated by **MERCEDES WILLIAMS** to **HENRY STERLING**.

During the call, the following exchange occurred between **HENRY STERLING** and

**MERCEDES WILLIAMS**:

> STERLING:  Hello.
> WILLIAMS:  What's up?
> STERLING:  Nothing.  What's up, honey?
> WILLIAMS:  Nothing.
> STERLING:  Awe, ain't doing shit, just sitting down while me and Junior and them
> eating right now.
> WILLIAMS:  Okay, well, call me later.

STERLING:  Hey, I might leave (unintelligible) that nigger HINEY called me, I'm gonna tell you for to, uh, go head on and give that nigger that (unintelligible) for me, you heard me?
WILLIAMS:  Okay.
STERLING:  Yeah, so, you know, and, don't let nobody go in your bedroom.
WILLIAMS:  I already cleaned it up (unintelligible) and I put it up.
STERLING:  Alright, hey.
WILLIAMS:  Huh?
STERLING:  Don't have all that shit in one spot together (unintelligible).
WILLIAMS:  I didn't, I didn't.
STERLING:  Alright.
WILLAIMS:  Alright.

20.     During the above telephone conversation, **HENRY STERLING** stated that he was going to send HINEY to **MERCEDES WILLIAMS'** apartment for a drug transaction, and that **HENRY STERLING** wanted **MERCEDES WILLIAMS** to sell HINEY cocaine. **MERCEDES WILLIAMS** agreed to conduct the drug transaction, and **HENRY STERLING** instructed **MERCEDES WILLIAMS** not to allow HINEY, or anyone else, into her bedroom.  **MERCEDES WILLIAMS** told **HENRY STERLING** she cleaned up and hid the drugs, drug paraphernalia or cash.  **HENRY STERLING** cautioned **MERCEDES WILLIAMS** not to hide all of the drugs, drug paraphernalia or cash in one place and **MERCEDES WILLIAMS** replied that she did not.

21.     On August 2, 2015, at approximately 7:27 p.m., agents intercepted a telephone call (Session 4250) initiated by HINEY to **HENRY STERLING**.  During the call, the following exchange occurred between **HENRY STERLING** and HINEY:

STERLING:  What up.
HINEY:  Hey look, Richie, I need one of them.
STERLING:  Alright, I fixing to call you right back.
HINEY:  Alright, alright.

11

22.     During the above telephone conversation, HINEY called **HENRY STERLING** and advised he wanted to purchase one ounce of cocaine or cocaine base. **HENRY STERLING** replied that he would call HINEY back.

23.     On August 2, 2015, at approximately 11:23 p.m., agents intercepted a telephone call (Session 4294) initiated by **HENRY STERLING** to **MERCEDES WILLIAMS**.  During the call, the following exchange occurred between **HENRY STERLING** and **MERCEDES WILLIAMS**:

STERLING:  Hey, you know where that scale at?  You know in that bag.  We ain't gonna talk or nothing like that, but you know where that, in that bag, in the kitchen?
WILLIAMS:  Um hm.
STERLING:  Man, you talking about you wanna turn into a whatumacallit?  You know how to work that bitch?
WILLIAMS:  I think I do.
STERLING:  Cut that bitch on and put a nickel on that bitch.
WILLIAMS:  Hold up.
STERLING:  Cut that bitch on and put a nickel, man, I'm gonna have to send you a picture of YG's homey.
WILLIAMS:  I put the nickel on there.
STERLING:  What it say?  Five?
WILLIAMS:  4.9.
STERLING:  Yeah, that's about right.  Look, check this out.  What about that shit in them pants?  What it weigh?
WILLIAMS:  I'll look.  Thirty-two.
STERLING:  So, what about if you take like five out of there?  How many is in, it in one clothes bag?
WILLIAMS:  (unintelligible).
STERLING:  Take and weigh it with the one.
WILLIAMS:  30 .0.
STERLING:  Um hm.  Look, this is what we gonna do.  I want you to lay around that bitch and take like four, like four outta there and make like twenty-eight.
WILLIAMS:  Make it what?  Twenty-eight?
STERLING:  Um hm.  What it say?
WILLIAMS:  Nineteen.
STERLING:  With what?  Everything?
WILLIAMS:  No, I took it out.
STERLING:  I want you to make that twenty-eight.  HINEY, I want you to call HINEY baby.  He gonna give you $1,100.  He gonna have to come meet you somewhere.  Out there somewhere.

WILLIAMS:  Okay.
STERLING:  Listen, nigger's number 47, 407-
WILLIAMS:  Hold on, what is it?
STERLING:  I'm give you a hundred dollars for that.  407-8582.
WILLIAMS:  8582?
STERLING:  Yeah.  Call me back, and hey, don't give that nigger, tell that nigger he can 1,100.  Yeah, that's your son.  That's HINEY.
WILLIAMS:  Okay, that's twenty-eight, right?
STERLING:  Yeah.
WILLIAMS:  Alright.

24.     During the above telephone conversation, **HENRY STERLING** asked **MERCEDES WILLIAMS** to find his scale located in the kitchen of her apartment, and cautioned **MERCEDES WILLIAMS** that they would not talk overtly over the phone. **HENRY STERLING** cautioned **MERCEDES WILLIAMS** that she is about to become a drug dealer.  **MERCEDES WILLIAMS** found the scale, and **HENRY STERLING** instructed **MERCEDES WILLIAMS** on how to check the accuracy of the scale by placing a nickel on it.  Affiant knows drug dealers place a nickel on a scale which should weigh five grams.  If the scale weighs the nickel at five grams, the scale is accurate.  After placing a nickel on **HENRY STERLING's** scale, **MERCEDES WILLIAMS** stated that the scale showed 4.9 grams.  **HENRY STERLING** was satisfied with the accuracy of the scale. **HENRY STERLING** then asked **MERCEDES WILLIAMS** to weigh a quantity of cocaine hidden inside a pair of pants located inside **MERCEDES WILLIAMS's** apartment, which weighed thirty-two grams.  **HENRY STERLING** instructed **MERCEDES WILLIAMS** to ensure the cocaine weighed twenty-eight grams, or one ounce, with the plastic bag.  **HENRY STERLING** then told **MERCEDES WILLIAMS** to charge HINEY $1,100 for the ounce of

13

cocaine. **HENRY STERLING** further instructed **MERCEDES WILLIAMS** to call

HINEY and arrange to meet HINEY for the drug transaction, to which **MERCEDES**

**WILLIAMS** agreed.

25.     On August 3, 2015, at approximately 12:01 a.m., agents intercepted a

telephone call (Session 4306) initiated by **HENRY STERLING** to HINEY. During the call,

the following exchange occurred between **HENRY STERLING** and HINEY:

> HINEY: Hello. Look, when I go there, hey, what that was, McDonald's?
> STERLING: Huh?
> HINEY: I'm trying to remember what that was, that McDonald's where we used to
> get you picking?
> STERLING: Yeah.
> HINEY: She was talking about a Wal-Mart (unintelligible) you know, I don't know, I
> got "WRONG" with me, you know what I'm saying? Talking about a Wal-Mart, like
> off the Interstate, I make that right and, uh, oughta be right up in there, huh?
> STERLING: Yeah, that bitch right there. The Wal-Mart right before ya'll get there.
> HINEY: Alright, but I told her I would call her when I just dropping (unintelligible)
> off and I head that way. I told her I call her when I get half way up there. I thought,
> man, that nigger had (unintelligible).
> STERLING: No, I didn't get no calls from you.
> HINEY: Yeah, she called me, I just told her, said, man, shit (unintelligible).

26.     During the above telephone conversation, HINEY described his conversation

with **MERCEDES WILLIAMS** to **HENRY STERLING**. HINEY stated that he spoke to

**MERCEDES WILLIAMS** about arranging the drug transaction for one ounce of cocaine.

**MERCEDES WILLIAMS** gave HINEY directions to her apartment, which included using

the Wal-Mart off of O'Neal Lane as a landmark. Affiant knows **MERCEDES**

**WILLIAMS'** apartment complex is adjacent to the Wal-Mart parking lot. **HENRY**

**STERLING** told HINEY that the Wal-Mart is right before **MERCEDES WILLIAMS'**

apartment. HINEY advised **HENRY STERLING** that HINEY told **MERCEDES**

**WILLIAMS** he would call her when he was driving towards her apartment.

14

27.     On August 3, 2015, at approximately 12:33 a.m., agents intercepted a

telephone call (Session 4307) initiated by HINEY to **HENRY STERLING**.  During the call,

the following exchange occurred between **HENRY STERLING** and HINEY:

> STERLING:  Hello.
> HINEY:  Hey, you could call, or you want me to call?  I'm passing Sherwood.
> STERLING:  Alright, give her a call.
> HINEY:  You want me to call?
> STERLING:  Call her.
> HINEY:  Alright.

28.     During the above telephone conversation, HINEY was driving toward

**MERCEDES WILLIAMS'** apartment for the drug transaction and was on I-12 passing

Sherwood Forest Boulevard.  HINEY asked **HENRY STERLING** if **HENRY STERLING**

was going to call **MERCEDES WILLIAMS**, or if HINEY should call **MERCEDES**

**WILLIAMS** and tell her that he was on his way to her apartment for the drug transaction.

**HENRY STERLING** told HINEY he needed to call **MERCEDES WILLIAMS**.

29.     On August 3, 2015, at approximately 11:47 p.m., agents intercepted a

telephone call (Session 4421) initiated by **MERCEDES WILLIAMS** to **HENRY**

**STERLING**.  During the call, the following exchange occurred between **HENRY**

**STERLING** and **MERCEDES WILLIAMS**:

> WILLIAMS:  What's up with your people?
> STERLING:  Who?
> WILLIAMS:  Last night.  You talked to him?
> STERLING:  Who?
> WILLIAMS:  What his name is?
> STERLING:  Who, HINEY?
> WILLIAMS:  Yeah.
> STERLING:  No, what there is to talk about?
> WILLIAMS:  Come pulling up with another nigger, reaching me some shit out the
> window, in front of people.  I was like what is you doing?  I don't even know you, but
> you doing that all, oh my bad, my bad.  I'm sorry, I'm sorry.  You tripping.
> STERLING:  You told him that?

15

WILLIAMS:  Just like that, yeah.

STERLING:  Alright then, told that bitch (unintelligible) yeah, tell him don't be doing like that.  He was on something.  But, that's good, see.  That's good you don't play with them.

WILLIAMS:  So he came sat his ass in the car and he like, two?  And I'm like no, just one.  I'm sorry, baby, kept apologizing.  Yeah, don't do that.

STERLING:  Yeah, what you want me to reach that shit out?  Nigger please, y'all know nothing about, nigger please, y'all know nothing about that.

WILLIAMS:  I know you're not supposed to do that shit.

STERLING:  Yeah, but serious, you ain't gonna be doing that.  If it wasn't him or CHRIS, I wouldn't even let you did that.

WILLIAMS:  Hmm.

STERLING:  Yeah, if it wasn't him or CHRIS, I wouldn't even le you did that, it's all good.

*(Later in the conversation)*

WILLIAMS:  You know some crazy-ass people.  Your little partner, your son.

STERLING:  You remember you got your car washed at the man's house.

WILLIAMS:  That's who that was?

STERLING:  Yeah, what the fuck you think I'm gonna be hanging out there with my bitch in the south side, pistol in the console around some niggers I don't trust at four in the morning?  Come on, man.

WILLIAMS:  I didn't even know that was him.  Okay, okay.

STERLING:  Yeah, that's HINEY.  That's the same person.  I ain't never gonna put you in no harm's way, what the fuck you think gonna happen.  I wouldn't even let you do that with LITTLE B.

30.     During the above telephone conversation, **MERCEDES WILLIAMS** called

**HENRY STERLING** to complain about HINEY's conduct during the drug transaction.

**MERCEDES WILLIAMS** did not like the fact that HINEY arrived to the drug deal with

another unknown individual and reached his hand out of his car window to give

**MERCEDES WILLIAMS** the money for the ounce of cocaine in front of people.  **HENRY**

**STERLING** told **MERCEDES WILLIAMS** she did the right thing by confronting HINEY

on his carless behavior.  **MERCEDES WILLIAMS** went on to describe how she conducted

the drug transaction with HINEY inside her vehicle.  **HENRY STERLING** assured

**MERCEDES WILLIAMS** he trusted HINEY and that he would not have let her conduct a

drug deal with anyone else except HINEY or **CHRISTOPHER STERLING**.  Later during

the conversation **HENRY STERLING** told **MERCEDES WILLIAMS** they had both been

to HINEY's house on a prior occasion.  On that occasion, **MERCEDES WILLIAMS** had

her vehicle washed at HINEY's residence.  **HENRY STERLING** went on to assure

**MERCEDES WILLIAMS** that he trusted HINEY so much that **HENRY STERLING** took

her to HINEY's residence with him and had a pistol inside the console of **MERCEDES**

**WILLIAMS'** vehicle at 4:00 a.m.  As **MERCEDES WILLIAMS** remembers going to

HINEY's residence with **HENRY STERLING**, he again told her that he would not put her

in harm's way by having her conduct a drug deal with someone he did not trust.

      31.    On August 18, 2015, at approximately 7:11 p.m., agents intercepted a

telephone call (Session 6283) initiated by DIAMEAN BROOKS to **HENRY STERLING**.

During the call, the following exchange occurred between BROOKS and **HENRY**

**STERLING**:

> STERLING:  Hello.
> BROOKS:  Yeah, um, nigger, say, um, you got five?
> STERLING:  Yeah.
> BROOKS:  Alright (unintelligible) the same?
> STERLING:  Um, yeah.
> BROOKS:  Alright, he say if you can, no problem, like, like, like chunks, nigger talking about something chunks, man.
> STERLING:  Awe, yeah, that ain't nothing (unintelligible).
> BROOKS:  Alright, alright, let me get it together, I'm gonna call you when I'm on my way.

      32.    During the above telephone conversation, BROOKS called **HENRY**

**STERLING** to purchase five ounces of cocaine.  BROOKS explained to **HENRY**

**STERLING** that he was buying the cocaine on a third party's behalf, and that the buyer

wanted the cocaine in "chunks" i.e. broken off directly from a pressed kilogram of cocaine.

**HENRY STERLING** told BROOKS he had cocaine in chunks.  BROOKS told **HENRY STERLING** he would call **HENRY STERLING** when he was on the way to meet **HENRY STERLING**.

33.    On August 18, 2015, at approximately 7:11 p.m., agents intercepted a telephone call (Session 6285) initiated by BROOKS to **HENRY STERLING**.  The following exchange occurred between BROOKS and **HENRY STERLING**:

> BROOKS:  Hello?  Hello?
> STERLING:  What up, D-Bo?
> BROOKS:  (Unintelligible) I don't know, my man, I'm trying to call this nigger.
> STERLING:  Alright.
> BROOKS:  Alright.

34.    During the above telephone conversation, BROOKS called **HENRY STERLING** to tell **HENRY STERLING** he was unable to contact the drug buyer.

35.    On August 18, 2015, at approximately 8:04 p.m., agents intercepted a telephone call (Session 6289) initiated by DIAMEAN BROOKS to **HENRY STERLING**.  During the call, the following exchange occurred between BROOKS and **HENRY STERLING**:

> STERLING:  Hello.
> BROOKS:  Yeah, I'm on my way to you.
> STERLING:  Hey, um, hey, I'ma lay around that bitch and probably meet you in the same little spot, bra, I ain't been staying at the house with the hoe over there, so I'm probably gonna meet you in the same little spot, bra.
> BROOKS:  Alright.

36.    During the above telephone conversation, BROOKS called **HENRY STERLING** to tell **HENRY STERLING** he was on the way to meet **HENRY STERLING** for the drug transaction.  **HENRY STERLING** told BROOKS he no longer lived at the residence in which he used to, and to meet him at the location where both **HENRY**

18

STERLING and BROOKS previously met for drug deals in the past. Affiant knows **HENRY STERLING** resided with MYESHA SELDERS at 6538 Vineyard Drive, Baton Rouge, Louisiana, before moving to **MERCEDES WILLIAMS'** apartment at 16141 Bristoe Avenue, Baton Rouge, Louisiana, 70816. BROOKS agreed to meet **HENRY STERLING** at the known location.

37.     On August 18, 2015, at approximately 8:31 p.m., agents intercepted a telephone call (Session 6293) initiated by DIAMEAN BROOKS to **HENRY STERLING**. During the call, the following exchange occurred between BROOKS and **HENRY STERLING**:

> STERLING:  D-Boy.
> BROOKS:  Yeah, I'm almost there.
> STERLING:  Alright, I'm, I'ma meet you there.
> BROOKS:  Alright.

38.     During the above telephone conversation, BROOKS told **HENRY STERLING** he was almost at the agreed upon location for the drug transaction. **HENRY STERLING** told BROOKS he would meet BROOKS at the location.

39.     On August 18, 2015, at approximately 8:41 p.m., agents intercepted a telephone call (Session 6295) initiated by DIAMEAN BROOKS to **HENRY STERLING**. During the call, the following exchange occurred between BROOKS and **HENRY STERLING**:

> STERLING:  Yeah.
> BROOKS:  I just pulled up.
> STERLING:  Alright.

40.     During the above telephone conversation, BROOKS called **HENRY STERLING** to tell **HENRY STERLING** that he was at the agreed upon location.

41.     As agents intercepted the telephone calls between **HENRY STERLING** and

BROOKS, other agents and detectives were conducting physical surveillance on **HENRY**

**STERLING**.  At approximately 8:35 p.m., surveillance observed **HENRY STERLING** and

**MERCEDES WILLIAMS** enter the Honda Accord bearing Louisiana license plate XYT

021 parked in front of 16141 Bristoe Avenue, Apartment D., Baton Rouge, Louisiana,

70816.  The maroon Honda Accord departed the apartment complex, and agents observed the

vehicle drive directly to the Exxon gas station located at 8455 Airline Highway, Baton

Rouge, Louisiana.  At approximately 8:45 p.m., the Honda Accord arrived at the Exxon gas

station, and agents observed **HENRY STERLING** exit the vehicle and enter a gray Toyota

Corolla bearing Louisiana license plate YPE 948.  At approximately 8:47 p.m., Agents

observed **HENRY STERLING** exit the gray Toyota Corolla and re-enter the Honda Accord.

Both vehicles then exited the Exxon parking lot and drove northbound on Airline Highway.

42.     At approximately 9:00 p.m., an East Baton Rouge Parish Sheriff's Office

(EBRSO) marked radio patrol motor vehicle initiated a traffic stop on the gray Toyota

Corolla near the intersection of Airline Highway and Samuel Road.  During the course of the

traffic stop, a search of the gray Toyota Corolla was conducted and law enforcement officers

seized approximately 150 grams of suspected cocaine.  BROOKS (the driver) and ALFRED

SULLIVAN (the passenger) were both arrested for distribution of cocaine.

43.     Based on the above intercepted wire communications, the physical

surveillance, and Affiant's training and experience, Affiant believes **HENRY STERLING**

resides with **MERCEDES WILLIAMS** at 16141 Bristoe Avenue, Apartment D., Baton

Rouge, Louisiana, 70816.  Additionally, Affiant believes **HENRY STERLING** and

**MERCEDES WILLIAMS** store cocaine and cocaine base inside their apartment, and both

20

use the apartment as a base for their illegal drug trafficking activities.  These activities

include cutting, weighing and preparing drugs for sale as described in session 4249.

Based upon my training, experience, and the foregoing facts, I have probable cause to

believe that **HENRY STERLING**, **MERCEDES WILLIAMS**, and others, have violated

and continue to violate Title 21, United States Code, Sections 841(a)(1) and 846, and Title

18, United States Code, Sections 922(g)(1), 924(c)(1)(A) and 2.  In addition, Affiant has

probable cause to believe that evidence of such offenses, namely, cocaine, cocaine base,

scales,  pots and pans containing cocaine or cocaine base residue, drug proceeds, and other

drug related items described in Attachment "B" will be found at the above-mentioned

location.


_____
SPECIAL AGENT BRETT D. SKILES


Sworn to and subscribed before me
this 27th day of August 2015,
Baton Rouge, Louisiana.


_____
RICHARD L. BOURGEOIS, JR.
UNITED STATES MAGISTRATE JUDGE


21



AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Middle District of Louisiana

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | )    Case No.    15- MJ-103 |
| | ) |
| 16141 Bristoe Avenue, Apartment D | ) |
| Baton Rouge, Louisiana 70816 | ) |
| | ) |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Middle_____ District of _____Louisiana_____
*(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT "A"

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT "B"

**YOU ARE COMMANDED** to execute this warrant on or before ___September 10, 2015___ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.      ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Richard L. Bourgeois, Jr._____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*     ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   __8/27/15 at 8:45am__

City and state:      __Baton Rouge, LA__

_____
*Judge's signature*

Richard L. Bourgeois, Jr., Magistrate Judge
*Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>   15- | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

| Certification |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT "A"

1.      The residential location to be searched is 16141 Bristoe Avenue, Apartment D, Baton Rouge, Louisiana, 70816.  This location is a residential apartment located on the ground-level of a two story apartment building.  If traveling north on O'Neal Lane, take a right (east) on Bristoe Avenue, and, in approximately 300 feet, Apartment D is located in the second residential apartment building on the left (the north side of Bristoe Avenue).  The front door of the apartment faces south.  The letter "D" appears on the front door. Additionally, Apartment "D" is located on the western side of the building, and there is a parking lot in front of the building.

## ATTACHMENT "B"

Items to be searched for and seized include:

1.  Cocaine, cocaine base, and other illegal drugs.

2.  Drug paraphernalia, including: scales, plastic baggies, plastic wrappers, and other plastic materials used to house cocaine and cocaine base for sale to customers.

3.  Pots, pans, or other dishes, items or containers used to convert cocaine into cocaine base, containing cocaine or cocaine base residue.

4.  Baking soda and other chemicals commonly used to covert cocaine into cocaine base.

5.  Sums of cash or currency.

6.  Any records of past, present or future drug transactions, legers or logs containing information about other drug dealers or transactions.

7.  Any firearms and/or ammunition.